Filed 4/23/13  Martinez v. Rite Aid CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| MARIA MARTINEZ, | B228621 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC401746) |
| v. | |
| RITE AID CORPORATION et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Susan Bryant-Deason, Judge.  Reversed and remanded with directions.

Shegerian & Associates, Carney R. Shegerian; Urbanic & Associates and James Urbanic for Plaintiff and Appellant.

Morgan, Lewis & Bockius, Thomas M. Peterson, Michelle Park Chiu and Kathryn T. McGuigan for Defendants and Appellants.

————————————

This appeal arises out of an employment discrimination case brought by plaintiff Maria Martinez against her former employer, defendant Rite Aid Corporation, and her former supervisor, defendant Kien Chau. Martinez alleged that, during her employment with Rite Aid, she was subjected to unlawful discrimination, harassment, and retaliation based on her disability, age, medical leave of absence, and complaint about sexual harassment. Following a lengthy trial, the jury found in favor of Martinez on her claims for wrongful termination in violation of public policy, intentional infliction of emotional distress, and invasion of privacy, and awarded Martinez $3.4 million in compensatory damages and $4.8 million in punitive damages. In their appeal, Rite Aid and Chau assert numerous legal errors, including challenges to the sufficiency of the evidence supporting the jury's special verdicts as to both liability and damages. In her cross-appeal, Martinez argues the trial court abused its discretion in denying her motion for leave to further amend her complaint to add statutory claims for violations of the California Fair Employment and Housing Act (FEHA).

We conclude that the evidence was sufficient to support the verdicts in favor of Martinez on her causes of action for wrongful termination in violation of public policy and intentional infliction of emotional distress, but not on her cause of action for invasion of privacy. We further conclude that the verdicts awarding compensatory damages to Martinez must be reversed because they were impermissibly ambiguous, and the verdict awarding punitive damages to Martinez must be reversed because the evidence was insufficient to support the imposition of punitive damages liability against Rite Aid for the acts of its employees. Finally, we conclude that the trial court did not abuse its discretion in denying Martinez leave to file a third amended complaint. We accordingly reverse and remand the matter for a new trial on the issue of compensatory damages as to Martinez's causes of action for wrongful termination in violation of public policy and intentional infliction of emotional distress.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**I.      Evidence at Trial**

**A.      Rite Aid's Structure and Policies**

Rite Aid is a large retail drugstore chain with approximately 4,700 stores.   Each Rite Aid store is divided into two business units:  (1) the front store; and (2) the pharmacy.  The front store is managed by a store manager who reports to a store district manager.  The pharmacy is managed by a pharmacy manager or a pharmacist-in-charge who reports to a pharmacy district manager.  The pharmacy typically is staffed with at least one pharmacist, pharmacy technician, and pharmacy cashier.  Both pharmacists and pharmacy technicians must be licensed by the state of California.

Rite Aid's employee handbook includes policies prohibiting discrimination, harassment, and retaliation in the workplace.  The employee handbook specifically provides that all complaints of discrimination will be investigated and remedial action taken where necessary.  The employee handbook also includes an associate complaint resolution procedure that allows employees to report any complaints to their direct supervisor, their human resources manager, or a toll-free call center where they may choose to remain anonymous.

**B.      Martinez's Job Responsibilities at Rite Aid**

Martinez began her employment with Rite Aid on November 14, 1983 at the age of 18.  After starting as an ice cream scooper, Martinez was soon promoted to a front-end cashier and then a pharmacy clerk.  In 1985, she became a pharmacy technician, and remained in that position until the termination of her employment in 2007.  In her first 20 years of employment at Rite Aid, Martinez was named "Employee of the Month" approximately 20 times and "Employee of the Year" two times in recognition of her excellent customer service.  During that time, she generally got along well with her supervisors and received positive feedback from Rite Aid about her work performance.  Rite Aid never received any customer complaints about Martinez at any time during her employment.

As a pharmacy technician, Martinez was responsible for inputting the information in a customer's prescription into Rite Aid's computer system and then preparing a prescription label that included such information as the customer's name, the prescribing physician's name, the type of medication, the dosage, the number of available refills, and the directions for use. After printing the label, Martinez was responsible for pulling the medication from the shelf and placing the medication, prescription, and label in a tray for the pharmacist to review. Martinez's job duties also included contacting physicians to verify prescriptions, assisting customers in dropping off and picking up prescriptions, operating the cash register at the pharmacy counter, and keeping the pharmacy area clean. As a technician, Martinez was not allowed to counsel customers about medications nor could she change a medication without the approval of the pharmacist and the prescribing physician.

Pharmacy technicians prepared an average of 50 to 100 prescription labels per day. Due to the large volume of prescriptions, it was common for technicians to occasionally make typographical errors on the labels that they prepared. Prescription labeling errors occurred on a daily basis in the pharmacy, although Martinez estimated that she only made such errors once per month. When labeling errors occurred, they typically were corrected by either the pharmacist or the technician prior to dispensing the medication to the customer. If a labeling error was made on a medication that was dispensed to the customer, the pharmacist was required to document the error in a quality assurance report. Rite Aid never received any quality assurance reports for a labeling error made by Martinez at any time during her employment.

At all relevant times, the terms and conditions of Martinez's employment, including her wages and eligibility for wage increases, were governed by a collective bargaining agreement between Rite Aid and Martinez's union. The collective bargaining agreement provided that non-probationary employees, such as Martinez, could not be discharged except for good cause, and that a discharge based on incompetency or failure to perform work required two prior warnings for related conduct within a 12-month period preceding the discharge.

4

## C.     February 2004 Medical Leave of Absence from the Pasadena Store

As of 2003, Martinez had been working at Rite Aid's Pasadena store for 15 years. The pharmacy manager was Sonal Desai and the store manager was Esmeralda Miranda. In late 2003, Martinez's work environment at the Pasadena store became increasingly stressful. Desai was pressuring the pharmacy staff to process more prescriptions and was having an ongoing conflict with Miranda about proper store procedures. In January 2004, Martinez requested a transfer to a Rite Aid store closer to her home. On February 9, 2004, during an argument between Desai and Miranda about Martinez's cash handling duties, Martinez suffered an anxiety attack and was taken from the store by ambulance to the hospital. Martinez was thereafter diagnosed with depression, prescribed Prozac and Xanax, and placed on a five-month medical leave of absence. Prior to that time, Martinez had never been treated for a psychiatric condition.

On February 13, 2004, Martinez sent a letter to the pharmacy district manager, John Acosta, and the store district manager, Bradley Lohman, following up on her prior request for a transfer from the Pasadena store. In her letter, Martinez stated that, due to her current health status, she was requesting a transfer with full accommodations to a different district. Martinez also stated that, during her 20-year employment with Rite Aid, she had never experienced the stress that she had been placed under by the store manager and the pharmacy manager, and that she found it unhealthy to return to that work environment.

On February 23, 2004, a registered nurse at Martinez's health care provider received a message that a person named "Sonal" had called seeking information about Martinez and had indicated in the call that Martinez's condition was not work-related. When the nurse returned the call, "Sonal" asked about Martinez's diagnosis, but was advised that a patient's diagnosis was confidential. At trial, Desai did not recall whether she contacted Martinez's health care provider, but denied that she ever told any other Rite Aid employees about Martinez's anxiety attack or leave of absence.

During her medical leave of absence, Martinez was informed by Rite Aid that her employment had been terminated. Rite Aid's computer system showed that Martinez

5

was discharged on February 26, 2004 for failing to report to work and that she was ineligible for rehire at that time. When Martinez inquired into the reason for her discharge, she was informed that she had failed to submit the required leave of absence forms. Martinez completed the necessary forms in June 2004 and was reinstated the following month.

### D. August 2004 Transfer to the Azusa Store

Martinez returned to work from her medical leave of absence in July 2004. She initially was transferred to the Altadena store where her pharmacy manager was Richard Chang. Although Martinez had a positive relationship with Chang and he never raised any concerns about her performance, she wanted to work at a store closer to her home. In August 2004, Martinez was transferred to the Azusa store near her home where her pharmacy manager was Ifon Chen.

Martinez never disclosed her medical condition or leave of absence to anyone at the Azusa store. However, Chen and two of Martinez's coworkers, Gabriela Gwecke and Helen Labosiere, made comments that Martinez believed were directed at her disability. Chen twice told Martinez in an angry manner that she was "mentally off." On one occasion, Chen called a customer service meeting with the pharmacy staff solely to tell Martinez that they did not like her. On another occasion, Chen falsely accused Martinez of submitting an insurance form for a customer with the incorrect date. When Martinez's coworkers would process prescriptions for anti-depressant medications, they would loudly announce the name of the medication and pointedly ask Martinez if she knew what it was for. In July 2005, while she was working at the Azusa store, Martinez was issued a written warning for acting outside the scope of her duties when she improperly counseled a customer about a medication.

### E. July 2005 Transfer to the Arcadia Store

In July 2005, Martinez was transferred to the Arcadia store where she worked until the termination of her employment. Chau was the pharmacist-in-charge and Janice Tam was the pharmacy district manager. Martinez never told Chau anything about her

6

medical history, and Chau denied any knowledge of Martinez's prior medical condition or leave of absence. However, in December 2005, Chau began making derogatory comments about Martinez's mental health and age. Chau told Martinez several times that "she needed to see [her] psychiatrist. Chau also told Martinez on multiple occasions that she was "crazy," "bipolar," and "psycho." In the presence of Martinez's younger coworkers, Chau said that Martinez was "too old," "over the hill," and "old enough to be [the coworkers'] mother." In addition to these comments, Chau made sudden changes to Martinez's work schedule and falsely told her that Tam wanted Martinez to work at night. On another occasion, Chau falsely accused Martinez of giving a medication to a customer for free.

### F. December 2006 Incident of Inappropriate Touching by Lohman

On December 6 or 9, 2006, Martinez saw Lohman, her former store district manager, at a bank. Lohman approached Martinez from behind and touched her shoulder and waist with both of his hands. As Lohman was touching Martinez, he said it was nice to see her. Martinez was shocked and uncomfortable by the touching and told Lohman, "I wish I could say the same thing." Lohman then let go of Martinez and left the bank. At the time of this incident, Lohman did not have any supervisory authority over Martinez.

### G. December 2006 Written Warning and Grievance

On December 8, 2006, prior to opening the pharmacy, Martinez asked Chau if she could have Tylenol for a headache. Although Chau instructed Martinez to get the Tylenol herself, Martinez was not comfortable taking any medication at work that was not dispensed directly by the pharmacist. When Martinez insisted that Chau hand the Tylenol to her, Chau slammed the medicine bottle on the counter and told Martinez, "I told you to get it yourself." A customer standing on the other side of the closed pharmacy window overheard the argument, and after he left, Chau told Martinez that she should not have asked for medication in front of a customer. During this incident, Martinez was not discourteous to either Chau or the customer.

7

On December 10, 2006, Chau sent an email to Tam, the pharmacy district manager, complaining for the first time about inappropriate conduct by Martinez. In his email, Chau stated that Martinez had slammed a medicine bottle on the counter after he had counseled her to not request medication for herself in front of a customer. Chau also stated that Martinez had made sexually harassing comments about a coworker in the presence of a customer and pharmacy staff. Chau requested that Martinez be terminated or transferred from the store and suggested a replacement pharmacy technician to fill her position. In addition, Chau noted that Martinez's coworkers would be providing written statements about her conduct shortly. On December 15, 2006, Chau prepared a written warning regarding Martinez's alleged conduct in slamming the medicine bottle on the counter, but Martinez refused to sign the warning at that time.

Frank Granillo was the human resources manager for the district where Martinez worked and handled the internal investigations involving Martinez. Granillo first became aware of Martinez in December 2006 when he was forwarded a copy of Chau's December 10, 2006 email. Prior to that date, Granillo had not received any complaints about Martinez from anyone at Rite Aid. In mid-December 2006, Chau provided Granillo with written statements from two of Martinez's coworkers, Genevieve Pasco and Becky Ngu, to support his complaints. In her statement, Pasco reported that, when a former male coworker came to visit the store, Martinez commented in the presence of a customer and other store employees that he was only visiting because he liked Pasco and wanted "'to jump her bones.'" Pasco described Martinez's comment as a form of sexual harassment and stated that she did not want Martinez to continue working at the store. In her statement, Ngu reported that she had difficulty working with Martinez because Martinez spoke to others in a condescending tone and whispered insults about coworkers and customers under her breath, including calling one customer a "'bitch.'" Ngu also stated that Martinez would fail to inform other staff members about pending prescription orders at the end of her shift.

On December 26, 2006, Martinez filed a grievance with her union in which she checked the box on harassment or discrimination and specifically alleged she had been

8

unjustly disciplined. Martinez had never previously made a complaint of harassment or discrimination during her employment with Rite Aid. On December 27, 2006, prior to receiving notice of the grievance, Granillo met with Martinez for the first time to discuss her refusal to sign the written warning issued by Chau. Martinez denied Chau's allegation that she had slammed a medicine bottle on the counter and Ngu's allegation that she had called a customer a derogatory name under her breath. Martinez was not asked about Pasco's sexual harassment allegation because Granillo was awaiting an additional witness statement about that incident. At the conclusion of the meeting, Martinez agreed to sign the written warning. Martinez did not raise any complaints about discrimination or harassment during the meeting.

### H.    January 2007 Written Warnings and Grievance

On January 3, 2007, Granillo received notice of Martinez's grievance, but did not consider it to be a complaint of discrimination or harassment and did not take any action to investigate it. On that date, Martinez filed a second grievance with her union in which she specifically alleged that she was being discriminated against and harassed by Chau. The following week, Granillo met with the coworkers who had provided written statements to Chau about Martinez's conduct and found those statements to be credible. In addition, Granillo obtained a written statement from a third coworker, Roya Rahmanian, who reportedly had witnessed Martinez's sexually harassing conduct. In her statement, which Granillo also found to be credible, Rahmanian confirmed that Martinez had asked a former coworker in the presence of a customer and store employees whether he still wanted to "'jump [Pasco's] bones.'" She further reported that, on one occasion, Martinez promised a customer that she would fill a prescription, but then took her break without doing so.

On January 20, 2007, Chau sent an email to Granillo and Tam complaining about other instances of inappropriate conduct by Martinez. In this email, Chau stated that Martinez consistently made prescription labeling errors, refused to follow her supervisor's directions, and told customers that understaffing at the pharmacy was the

9

reason for delays with their prescriptions. Chau also stated that, when Martinez took two days of sick leave that month, she provided a medical note that failed to specify the name of her doctor or the reason for her illness. The January 20, 2007 email from Chau was the first time that Granillo received any complaints about prescription labeling errors by Martinez. However, Granillo did not conduct any follow up investigation with Chau about these particular complaints.

On January 23, 2007, Granillo met with Martinez to issue her two written warnings. The first warning stated that Martinez made an inappropriate sexual comment about Pasco in the presence of a customer and other store employees and that such conduct violated the company's anti-harassment policy. The second warning stated Martinez frequently made prescription labeling errors, failed to alert other staff members about outstanding prescription issues at the end of her shift, and openly criticized her coworkers and complained about the working conditions at Rite Aid. In deciding to issue the two warnings, Granillo relied on the information reported to him directly by Chau, on the written statements that Chau had obtained from Martinez's coworkers, and on Granillo's meetings with the coworkers about those statements. At that time, Granillo was aware that Martinez had not previously been issued a written warning for a poor work attitude or prescription labeling errors at any time in her employment with Rite Aid.

During the January 23, 2007 meeting, Martinez denied that she had engaged in any inappropriate conduct. She admitted that she occasionally made prescription labeling errors, but explained that it was a common occurrence among pharmacy staff. She also admitted that she had discussed her concerns about understaffing in the pharmacy with her supervisors, but denied that she openly complained to coworkers or customers about staffing issues. Granillo insisted that Martinez had to be guilty of something and that she needed to admit one of the allegations in the warnings. At the conclusion of the meeting, Martinez signed both warnings and added a statement that she would try her best to eliminate errors in the pharmacy. Around that time, Martinez complained to Granillo that Chau had called her "psycho" and that she believed there was a conspiracy to push her out of the store. Apart from reporting Chau's comment, which Granillo did not consider

10

to be harassing, Martinez did not raise any complaints about discrimination or harassment in her January 2007 meetings with Granillo.

### I. Withdrawal of December 2006 Written Warning

Shortly after Martinez was issued the two January 2007 written warnings, Granillo was notified in writing by two of Martinez's coworkers that Chau had asked them for assistance in getting Martinez fired. In her statement, Melonnie Atianzar reported that Chau had asked her to lie to upper management about work schedule issues involving Martinez so that Martinez would "'pay for what she has done and . . . be punished for her actions.'" In her statement, Lydia Garcia reported that Chau had promised her an internship in the pharmacy if she helped him get Martinez fired.

On January 30, 2007, Granillo had a follow up meeting with Pasco who denied that she had ever been asked to lie about Martinez. During the meeting, Pasco described Martinez as careless in her work and lacking in focus, and she recounted one prescription labeling error that Martinez had made. Pasco also reported that Martinez would tell customers that the pharmacy was understaffed when their prescriptions were not ready. That same day, Chau sent another email to Granillo and Tam complaining that Martinez had accused him of being prejudiced when he attempted to change her work schedule.

On February 2, 2007, Granillo met with Chau about his alleged misconduct. Chau denied that he asked any subordinate employees for assistance in getting Martinez fired. However, based on the statements provided by Atianzar and Garcia, Granillo concluded that Chau violated Rite Aid's code of ethics policy and standards of conduct by soliciting employees to lie about Martinez. Granillo placed Chau on a nine-day suspension, demoted him to the position of staff pharmacist with an accompanying reduction in pay, and issued him a final written warning. Granillo also transferred Chau to another Rite Aid store so that he would have no further contact with Martinez.

On February 5, 2007, Granillo withdrew the December 2006 written warning that Chau had issued to Martinez for slamming a medicine bottle on the counter because that allegation was based solely on information provided by Chau. Granillo did not withdraw

11

the January 2007 written warnings that he had issued to Martinez for sexual harassment and poor work performance because he believed those allegations had been substantiated by Martinez's coworkers. However, Granillo admitted that, when he issued the January 2007 warnings, no one other than Chau had complained about multiple labeling errors by Martinez.

### J. March 2007 Written Warning and Grievance

Following Chau's transfer, Chen Chen Hwang temporarily filled in as a pharmacist at the Arcadia store. In February 2007, at the request of a customer, Martinez asked Hwang if a prescribed medication had a generic equivalent that could be provided to the customer at a lower cost. Hwang instructed Martinez to prepare a prescription label for a similar generic drug and indicated that Hwang would contact the prescribing physician for approval. However, on February 22, 2007, Hwang sent an email to Tam complaining that Martinez had acted outside the scope of her duties when she changed a customer's medication without prior authorization from the pharmacist or prescribing physician. On March 14, 2007, Tam issued a written warning to Martinez based on the incident reported by Hwang. Although Granillo received copies of Hwang's email and Martinez's warning, he did not follow up with Hwang or Tam about the circumstances surrounding that warning. Martinez thereafter filed a third grievance with her union in which she alleged that the March 2007 warning was unjust, but did not specifically complain about discrimination or harassment by Hwang.

### K. March 2007 Threat of Retaliation by Lohman

In March 2007, Lohman became the store district manager and Acosta became the pharmacy district manager for the Arcadia store. During a March 7, 2007 visit to the store, Lohman asked Martinez if she was the same girl that he saw at the bank. When Martinez answered that she was, Lohman told her that he knew she was a problem and he was going to take care of her. Martinez felt threatened by Lohman's comment and feared she would be fired, but she did not immediately report it to anyone at Rite Aid. However, shortly after this incident, Lohman himself told both Granillo and Acosta about

12

his comment to Martinez. Although Granillo believed the comment was inappropriate, he considered it to be an "empty threat" because Lohman did not have direct supervisory authority over Martinez. Granillo orally counseled Lohman about his comment and instructed him to stay away from Martinez, but did not take any other disciplinary action against him. Lohman did not have any further contact with Martinez.

### L. March to May 2007 Requests for Time Off for Doctor's Appointments

In March 2007, Angelene Chan was hired as the pharmacy manager for the Arcadia store. Prior to joining the Arcadia store, Chan was trained for two weeks at the Pasadena store by Desai, Martinez's former pharmacy manager who had witnessed her anxiety attack in February 2004. During her training, Chan asked Desai about the Arcadia store staff. Desai mentioned that Martinez previously had worked for her as a pharmacy technician. Both Desai and Chan denied that they discussed Martinez's medical condition or the circumstances under which she left the Pasadena store.

In mid-March 2007, Dr. Jack Boghosian, a psychologist at Kaiser, diagnosed Martinez as having an adjustment disorder with an anxious and depressed mood. Dr. Boghosian began treating Martinez with individual and group psychotherapy. In May 2007, Martinez also sought treatment with Dr. Jim Chomchai, a psychiatrist at Kaiser, who diagnosed Martinez with major depression and prescribed Prozac and Ativan. At that time, Dr. Chomchai recommended that Martinez take a disability leave because the depression was affecting her ability to work, but Martinez declined. Instead, she continued taking her prescribed medications and attending regular appointments with both Dr. Boghosian and Dr. Chomchai.

During the first few months that Martinez reported to Chan, Martinez would notify Chan when she needed time off from work for a doctor's appointment. Prior to May 2007, Chan allowed Martinez to attend each of her scheduled doctor's appointments and did not raise any concerns with Martinez about her performance or requests for time off from work. At some point, Martinez disclosed to Chan that her appointment was with a psychiatrist or psychologist. Following that disclosure, Chan began making comments

13

about Martinez's mental health when Martinez asked for time off to attend an appointment. Chan would respond to Martinez's requests in a mocking tone, asking her "what's the matter, are you feeling sick, do you need to see your psych." On other occasions, Chan told Martinez she was "mentally a problem" and should "go see [her] psychiatrist." In addition to these comments by Chan, Granillo told Martinez at some point that she was "unbalanced" and Acosta said that she was "mentally off."

### M. May 2007 Filing of EEOC Charge

On May 11, 2007, Martinez filed an administrative charge with the Equal Employment Opportunity Commission (EEOC) in which she alleged retaliation and discrimination on the basis of her sex, age, and national origin, but not on the basis of her disability. In her EEOC charge, Martinez specifically complained about Lohman's act of inappropriate touching and his subsequent threat of retaliation. She also complained about the March 2007 written warning issued by Tam and Hwang for allegedly changing a customer's medication without approval. Prior to filing the EEOC charge, Martinez called Rite Aid's toll-free telephone number for employee complaints and left a message, but she never received any response.

### N. May 2007 Oral Counseling

On May 14, 2007, Chan sent an email to Acosta complaining that Martinez was failing to follow instructions and taking two-hour breaks without her approval. In a subsequent meeting with Granillo and Acosta, Chan explained that Martinez was taking two-hour lunch breaks every other week to attend doctor's appointments and was not giving sufficient notice of her need for time off. Chan also reported that Martinez was refusing to perform certain tasks, such as restocking unclaimed prescriptions and working the cash register. Chan did not raise any concerns about prescription labeling errors at that time.

On May 22, 2007, Martinez was scheduled to attend a doctor's appointment. Chan told Martinez that she had to find her own coverage or she could not attend the appointment. That same day, Granillo and Acosta met with Martinez about Chan's

14

complaints. Martinez told Granillo that she needed time off from work to see her doctor and had been notifying Chan of her scheduled appointments. Martinez further explained that, in February 2004, she had become sick and had to be taken from the Pasadena store by ambulance. She expressed concern that Desai was telling other employees, including Chan, about her prior illness. She did not, however, disclose the nature of her illness in the meeting. Martinez also reported that Chan was treating her rudely, but she did not specifically allege that Chan was harassing or discriminating against her. Near the end of the meeting, Martinez complained for the first time about Lohman. She told Granillo about Lohman's December 2006 act of unwanted touching as well as his March 2007 comment about Martinez being a problem that he would take care of. In addition, Martinez informed Granillo that she recently had filed an administrative charge with the EEOC.

During the May 22, 2007 meeting, Granillo orally counseled Martinez that she was responding inappropriately to the instructions given by Chan. Granillo did not investigate Martinez's complaint of inappropriate touching by Lohman because he did not consider the touching to be sexual harassment despite Martinez's statement that it was unwanted and made her uncomfortable. Granillo also did not investigate Martinez's complaint that Desai was sharing information about her prior illness with other employees because he did not believe a manager would engage in such conduct two years later. Shortly after the meeting, Granillo received notice of Martinez's EEOC charge, which he discussed with Bradley Sapp, the director of human resources for Rite Aid's western division.

### O.     July 2007 Written Warning and Grievance

At some point after the May 22, 2007 meeting, Chan informed Martinez that she did not want her taking any more time off from work to attend doctor's appointments. Chan also refused Martinez's request to take two vacation days in June 2007, including one day to attend her son's graduation. In response to Martinez's request for vacation

time, Chan wrote on the scheduling calendar that Martinez had to find her own coverage or her request was not approved.

On June 13, 2007, Chan sent a second email to Acosta in which she complained that Martinez was treating her rudely and still refusing to perform certain tasks, but did not raise any concerns about prescription labeling errors. The following day, Chan sent an unauthorized memo to all pharmacy staff members stating that two-hour lunches were not allowed unless medically necessary and that requests for time off had to be submitted two weeks in advance and approved by the pharmacy manager. The memo also stated that the failure to report to work as scheduled would result in disciplinary action, including termination.

Martinez had a doctor's appointment scheduled for June 27, 2007, which required her to start her shift one-half hour late. Prior to attending that appointment, Martinez provided Chan with a copy of an appointment card from her health care provider showing that she was scheduled to see Dr. Chomchai in the psychiatry department. On June 26, 2007, Chan sent a third email to Acosta complaining about Martinez. In this email, Chan reported that Martinez made multiple prescription labeling errors, refused to take responsibility for her mistakes, and openly criticized the mistakes of others. Chan also stated that Martinez repeatedly failed to follow her orders to perform assigned tasks, including working the cash register, and that she responded to Chan's instructions in a negative and aggressive manner. Chan's June 26, 2007 email was the first time she complained about prescription labeling errors by Martinez.

On July 3, 2007, Granillo and Acosta met with Martinez to issue her a final written warning. The warning stated that Martinez continued to make prescription labeling errors, repeatedly ignored or responded negatively to her supervisor's directions, disrupted service levels by refusing to cashier when necessary, and openly complained about her coworkers' performance. In deciding to issue the final warning, Granillo relied in part on the information reported by Chan in her June 26, 2007 email. Granillo also relied in part on the prior information reported by Chau about Martinez's labeling errors to substantiate Chan's similar complaint. During the meeting, Martinez denied each of

16

the allegations in the warning, but did not specifically complain about any discriminatory or harassing conduct by Chan. After Granillo told Martinez that she could not leave the meeting without signing the warning, Martinez complied and signed it. On July 6, 2007, Martinez filed a fourth grievance with her union in which she alleged that the final warning was unjust and that Chan was harassing her.

On July 17, 2007, Martinez sent a letter to Granillo requesting a copy of her complete personnel file. Although Rite Aid was required by law to maintain personnel files for its employees, Granillo was unable to provide Martinez with the requested copy because any records from her personnel file prior to 2004 had been lost. Granillo never informed Martinez that Rite Aid had lost her personnel file or otherwise responded to her request.

### P.  July 2007 Suspension and Subsequent Termination

On July 25, 2007, Chan reported to Granillo that she had documented eight prescription labeling errors recently made by Martinez over a period of three days. Chan also provided Granillo with copies of the prescriptions and the corresponding labels. The labels identified Martinez as the technician who was logged onto the pharmacy's computer system when the labels were prepared.

On July 31, 2007, Granillo and Acosta met with Martinez about the prescription labeling errors. Martinez acknowledged that she had made one of the errors alleged, but stated that she believed Chan had fabricated the other errors by changing the labels while Martinez was away from the computer but still logged onto the system. In response to Granillo's stated concern that Martinez was not getting along with Chan or following her directions, Martinez reported that Chan often asked her to perform multiple tasks at the same time and that Martinez did her best to comply with all of Chan's orders. During the meeting, Martinez provided Granillo with a copy of a July 27, 2007 letter that she had sent to Rite Aid's chief executive officer complaining about a hostile work environment. When Granillo asked Martinez for specifics about her grievance complaint that Chan was harassing her, Martinez described concerns that she had with Chan's tone and demeanor,

17

but did not complain that Chan had been making any inappropriate comments to her. At the conclusion of the meeting, Granillo placed Martinez on suspension and planned to terminate her employment at that time. Martinez never received a response from anyone at Rite Aid to her July 27, 2007 letter.

On August 8, 2007, following a final grievance meeting with Martinez, Granillo and Sapp decided to terminate her employment. In making the termination decision, Sapp relied solely on the information provided by Granillo. Granillo relied, in part, on the information provided by Acosta about the complaints he had received from Chan about Martinez. Granillo also relied, in part, on the prior written warnings that were issued to Martinez in January and July 2007, and on the information provided by both Chan and Chau to support those warnings. On August 16, 2007, Martinez was notified in writing that her employment with Rite Aid had been terminated. At the time of the termination, Martinez had been employed by Rite Aid for over 23 years.

### Q. Martinez's Evidence of Economic Damages

Dr. Tamorah Hunt, Martinez's forensic economist, testified about her economic damages. At the termination of her employment, Martinez's average past annual income was $33,581. Dr. Hunt calculated Martinez's past economic loss based on her projected lost earnings and lost employer benefit contributions from the termination of her employment in August 2007 to the start of the trial in August 2010. Based on Dr. Hunt's calculations, Martinez's past economic loss was $57,489. Dr. Hunt also calculated Martinez's future economic loss for three alternative time periods from the termination of her employment assuming that Martinez remained unemployed for the duration of that period. Based on Dr. Hunt's calculations, Martinez's total economic damages, including both past and future economic loss, would be $278,446 at 6 years, $446,621 at 8 years, and $634,055 at 10 years from the date of her discharge from Rite Aid.

### R. Martinez's Evidence of Non-Economic Damages

Dr. Boghosian was Martinez's treating psychologist between March and December 2007. In March 2007, Martinez presented with symptoms of anxiety and

18

depression caused by job-related stress, and specifically complained that she was being subjected to harassing and retaliatory conduct at work. She credibly denied that there were any other stressors in her life causing her symptoms. Over the next few months, Martinez regularly attended individual and group therapy sessions with Dr. Boghosian where she continued to complain about job-related stress. In August 2007, shortly after her discharge, Martinez appeared very discouraged and distraught, and was diagnosed by Dr. Boghosian with major depression. As of her last session in December 2007, Martinez was still struggling with the emotional impact of losing her job because she had invested much of her identity in her employment at Rite Aid.

Dr. Chomchai was Martinez's treating psychiatrist from May 2007 through February 2008. In May 2007, Dr. Chomchai diagnosed Martinez with major depression, which was recurrent and moderate. At that time, Martinez complained of job-related stress; her symptoms included depressed mood, insomnia, fatigue, change in appetite, and feelings of hopelessness. Dr. Chomchai ruled out any stressors other than Martinez's job and psychiatric condition as the cause of her symptoms. At her last appointment with Dr. Chomchai in February 2008, Martinez's diagnosis remained major depression, but she was in partial remission with minimal anxiety and no depressed mood. Although Dr. Chomchai considered Martinez's prognosis to be good, he believed that she needed to continue anti-depressant medication and treatment with a mental health care provider.

Dr. Craig Snyder, a clinical psychologist who was retained by Martinez's attorney, conducted a forensic evaluation of Martinez in March 2009 and March 2010. It was Dr. Snyder's opinion that, prior to 2003, Martinez was not suffering from any psychiatric impairment. However, after returning from a medical leave of absence in 2004, Martinez began experiencing clinical symptoms of anxiety and depression, and by early 2007, she met the criteria for a depressive disorder and anxiety disorder. Martinez's depression and anxiety became significantly worse upon her termination of employment in August 2007, at which time she met the criteria for a major depressive disorder. Dr. Snyder opined that the cause of Martinez's depression and anxiety was the treatment by her supervisors at Rite Aid. As of March 2010, Martinez's symptoms had improved and were more mild to

19

moderate in nature. Martinez's prognosis was slightly better than fair at that time, although she remained susceptible to relapse if she were to experience another major stressful event.

## II. Jury Verdicts and Damages Awards

Following a four-week trial, the jury returned a special verdict in favor of Martinez on her causes of action for wrongful termination in violation of public policy, intentional infliction of emotional distress, and invasion of privacy. The jury awarded Martinez $3.35 million in compensatory damages against Rite Aid consisting of $1,116,666 for wrongful termination in violation of public policy, $1,116,666 for intentional infliction of emotional distress, and $1,116,668 for invasion of privacy. The jury also awarded Martinez $50,000 in compensatory damages against Chau for intentional infliction of emotional distress.

On the wrongful termination claim alleged against Rite Aid, the jury found that Martinez had a mental disability that was known to the decision-makers or other supervisory personnel who contributed to the decision to terminate her employment, that Martinez took a medical leave of absence for a serious health condition in 2004, and that Martinez complained about sexual harassment to the EEOC or Rite Aid. The jury further found that Martinez's mental disability, medical leave of absence, and complaint of sexual harassment were a motivating reason for Rite Aid's termination decision.[1] The jury's award of $1,116,666 against Rite Aid on this claim consisted of $20,000 in past economic loss, $150,000 in future economic loss, $813,333 in past non-economic loss, and $133,333 in future non-economic loss.

On the intentional infliction of emotional distress claims alleged against both Rite Aid and Chau, the jury found that Rite Aid's employees or managers, including Chau, engaged in outrageous conduct toward Martinez between December 2006 and

---

[1] The jury rejected Martinez's claim that her age was a motivating reason for Rite Aid's termination decision.

August 2007 while acting in the course and scope of their employment. The jury also found that Rite Aid and Chau intended to cause Martinez emotional distress or acted in reckless disregard of the possibility she would suffer emotional distress, and that such conduct was a substantial factor in causing her to suffer severe emotional distress. The jury's award of $1,116,666 against Rite Aid on this claim consisted of $20,000 in past economic loss, $150,000 in future economic loss, $813,333 in past non-economic loss, and $133,333 in future non-economic loss. The jury's award of $50,000 against Chau consisted of $12,500 on each category of past economic loss, future economic loss, past non-economic loss, and future non-economic loss.

On the invasion of privacy claim alleged against Rite Aid, the jury found that a Rite Aid employee publicized private information about Martinez's mental disability which a reasonable person in Martinez's position would consider highly offensive. The jury further found that Rite Aid either knew or acted with reckless disregard of the fact that a reasonable person in Martinez's position would consider the disclosure highly offensive, and that the conduct was a substantial factor in causing Martinez harm. The jury's award of $1,116,668 against Rite Aid on this claim consisted of $20,000 in past economic loss, $150,000 in future economic loss, $813,334 in past non-economic loss, and $133,334 in future non-economic loss.

In the special verdict, the jury also found that Martinez had proved by clear and convincing evidence that one or more officers, directors, or managing agents of Rite Aid acted with malice, oppression, or fraud, and either authorized such conduct or knew of such conduct and approved it after it occurred. Based on the jury's findings, the trial moved to a punitive damages phase where the jury returned a special verdict awarding Martinez $4.8 million in punitive damages against Rite Aid.

### III.    Post-Trial Motions and Appeals

On November 1, 2010, the trial court entered judgment in favor of Martinez on the special verdicts. On November 15 and 16, 2010, Rite Aid and Chau jointly filed a motion for a new trial and a motion for judgment notwithstanding the verdict. However,

neither motion was heard or ruled upon by the trial court within the applicable 60-day statutory period. Rite Aid and Chau jointly filed timely notices of appeal from the judgment on the special verdicts and from the denial, by operation of law, of their post-trial motions. Martinez filed a timely notice of cross-appeal from a pre-trial order denying her motion for leave to file a third amended complaint.

## DISCUSSION

### I. Jury Verdicts on Liability

On appeal, Rite Aid and Chau challenge the sufficiency of the evidence supporting the jury verdicts in favor of Martinez on her claims for wrongful termination in violation of public policy, intentional infliction of emotional distress, and invasion of privacy. "When a party contends insufficient evidence supports a jury verdict, we apply the substantial evidence standard of review. [Citation.]" (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.) "We must 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. . . .' [Citation.]" (*Ibid.*) "'[N]either conflicts in the evidence nor "'testimony which is subject to justifiable suspicion . . . justif[ies] the reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'" [Citations.]' [Citation.]" (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) Accordingly, "'when a [verdict] is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the [verdict]. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the [trier of fact].'" (*Western State Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571.)

22

## A.    Wrongful Termination in Violation of Public Policy

In its special verdict, the jury found in favor of Martinez on her cause of action for wrongful termination in violation of public policy under three alternative theories: (1) discrimination based on a mental disability; (2) retaliation for taking a medical leave of absence, and (3) retaliation for complaining about sexual harassment.  Rite Aid contends that Martinez's wrongful termination claim fails as a matter of law under each of the three theories.  We conclude, however, that there was substantial evidence to support the jury's finding that Rite Aid terminated Martinez's employment because of her sexual harassment complaint, and that the jury's verdict on the wrongful termination claim must be affirmed.[2]

To prevail on a claim for wrongful termination in violation of public policy, a plaintiff must show that (1) he or she was employed by the defendant; (2) the plaintiff's employment was terminated; (3) the termination violated public policy; and (4) the termination caused the plaintiff damages.  (*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 641; *Holmes v. General Dynamics Corp.* (1993) 17 Cal.App.4th 1418, 1426, fn. 8.)  In addition, the public policy allegedly violated must be substantial and fundamental, articulated at the time of termination, and embodied in either a constitutional or statutory provision.  (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890; *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1090-1091, overruled on other grounds in *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80, fn. 6.)  FEHA's policies prohibiting discrimination and retaliation in employment are sufficiently substantial and fundamental to support a common law claim for wrongful termination in violation of public policy.  (*City of Moorpark v. Superior Court* (1998) 18

---

[2]     In light of this conclusion, we need not consider whether there was sufficient evidence to support the jury's findings that Rite Aid also terminated Martinez's employment because of her mental disability and her medical leave of absence.

Cal.4th 1143, 1159-1161; *Stevenson v. Superior Court*, *supra*, at pp. 895-897; *Gantt v. Sentry Insurance*, *supra*, at pp. 1096-1097.)[3]

FEHA specifically provides that it is an unlawful employment practice for "any employer … or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (Gov. Code, § 12940, subd. (h).) When a plaintiff alleges a retaliatory termination either as a statutory claim under the FEHA or as a common law claim for wrongful termination in violation of public policy, California courts apply the three-step burden-shifting analysis of *McDonnell Douglas Corp. v Green* (1973) 411 U.S. 792 to evaluate the claim. (*Loggins v. Kaiser Permanente International* (2007) 151 Cal.App.4th 1102, 1108-1109.) "[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for

---

[3]     The trial court instructed the jury on Martinez's wrongful termination claim with the following modified version of CACI No. 2430: "Maria Martinez claims she was discharged from employment for reasons that violate a public policy. To establish this claim, Maria Martinez must prove all of the following: [¶] 1. That Maria Martinez was employed by Rite Aid Corporation; [¶] 2. That Rite Aid Corporation discharged Maria Martinez; [¶] 3. That any of the following, Maria Martinez's mental disability, medical leave, age, and/or complaints about sexual harassment was a motivating reason for her discharge; and [¶] 4. That the discharge caused Maria Martinez harm."

The California Supreme Court recently held that a plaintiff alleging discrimination in violation of FEHA must prove the discrimination was a "substantial motivating factor" in the adverse employment decision. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 225, 232.) However, neither Rite Aid nor Martinez has alleged any instructional error in this case, nor do they argue that the distinction between a "motivating factor" and a "substantial motivating factor" is determinative of any issue raised on appeal.

24

the adverse employment action, the presumption of retaliation ""'drops out of the picture,'"" and the burden shifts back to the employee to prove intentional retaliation. [Citation.]" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

"'The retaliatory motive is "proved by showing that plaintiff engaged in protected activities, that his employer was aware of the protected activities, and that the adverse action followed within a relatively short time thereafter." [Citation.] "The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision.'" [Citation.]' [Citation.]" (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69-70.) Proof of intentional discrimination or retaliation often depends on circumstantial evidence because it consists of "subjective matters only the employer can directly know, i.e., his attitude toward the plaintiff and his reasons for taking a particular adverse action." (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713.) Nevertheless, "[t]he central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus." (*Id*. at p. 715.)

Rite Aid argues that Martinez failed to show that she engaged in protected activity when she complained about sexual harassment by Lohman because Lohman's isolated act of unwanted touching outside the workplace did not constitute actionable sexual harassment as a matter of law. However, "an employee's conduct may constitute protected activity for purposes of the antiretaliation provision of the FEHA not only when the employee opposes conduct that ultimately is determined to be unlawfully discriminatory under the FEHA, but also when the employee opposes conduct that the employee reasonably and in good faith believes to be discriminatory, whether or not the challenged conduct is ultimately found to violate the FEHA." (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1043.) As our Supreme Court has explained, "[e]mployees often are legally unsophisticated and will not be in a position to make an informed judgment as to whether a particular practice or conduct *actually* violates the governing

25

antidiscrimination statute. A rule that permits an employer to retaliate against an employee with impunity whenever the employee's reasonable belief turns out to be incorrect would significantly deter employees from opposing conduct they believe to be discriminatory. [Citations.]" (*Ibid.*) Thus, "'it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case.'" (*Id.* at p. 1043, fn. 4, italics omitted; see also *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 474 ["[a]n employee is protected against retaliation if the employee reasonably and in good faith believed that what he or she was opposing constituted unlawful employer conduct such as sexual harassment or sexual discrimination"].)

In this case, the jury reasonably could have found that Martinez had a good faith belief that she was complaining about unlawful conduct by Lohman. Martinez testified that, when she saw Lohman at a bank, he touched her shoulder and waist in a manner that was inappropriate and made her feel uncomfortable. A few months later, after Lohman became the store district manager for the Arcadia store where Martinez worked, he approached Martinez, asked if she was the same "girl" from the bank, and then told her that he knew she was a problem and he was going to take care of her. Martinez reasonably, even if mistakenly, could have believed that Lohman was threatening to terminate her employment at that time for rebuffing his prior sexual advance, and that his comment when considered in conjunction with his earlier act of unwanted touching was a form of either quid pro quo sexual harassment or retaliation. Even assuming such conduct did not actually rise to the level of actionable harassment or retaliation, there was sufficient evidence to support a finding that Martinez engaged in protected activity when she made a good faith complaint about sexual harassment to both Granillo and the EEOC.

Rite Aid further contends that the two and a half month time gap between Martinez's May 2007 complaint and her August 2007 discharge is insufficient to demonstrate the requisite causal connection for her wrongful termination claim, particularly where Martinez made her sexual harassment complaint only after she had been counseled on performance-related issues. Rite Aid also claims that it provided legitimate, non-retaliatory reasons for discharging Martinez based on deficiencies in her

26

performance and attitude, and that Martinez's personal belief that the stated reasons were untrue is insufficient to show pretext. However, a thorough review of the record reflects that Martinez presented substantial evidence beyond a mere temporal proximity and subjective belief about her job performance to support a finding that Rite Aid acted with a retaliatory animus in the discharge decision.

Granillo testified that he terminated Martinez's employment for two specific reasons: (1) her continued prescription labeling errors, and (2) her poor work attitude. However, the jury heard testimony from multiple Rite Aid pharmacists and pharmacy technicians apart from Martinez that prescription labeling errors occurred on a daily basis in the pharmacy and that such errors typically were corrected by either the pharmacist or the technician before the medication was dispensed to the customer. The jury also heard testimony that none of the prescription labeling errors made by Martinez during her 23-year employment at Rite Aid ever resulted in a medication being dispensed to a customer with incorrect information on the prescription label. From this evidence, the jury reasonably could have inferred that Rite Aid generally did not regard prescription labeling errors as a performance issue that warranted discharge, but Granillo decided to treat Martinez differently.

Granillo also testified that, in making the discharge decision, he relied on information provided by both Chan and Chau about Martinez's performance-related issues. However, at that point, Granillo knew Chau had engaged in serious misconduct by soliciting employees to provide false statements about Martinez for the purpose of getting her fired. While Granillo took prompt disciplinary action against Chau for his misconduct, he did not withdraw the January 2007 written warning that had been issued to Martinez for making prescription labeling errors, even though Chau was the only person who had ever complained about multiple labeling errors by Martinez at that time. Instead, Granillo chose to rely on that prior written warning, and the potentially flawed information provided by Chau to support the warning, when he decided to discharge Martinez for continuing to make such errors. Granillo also chose to rely on the information provided by Chan, even though Chan did not raise any concerns about

27

prescription labeling errors until after Martinez complained that Chan was not allowing her to take time off from work to attend doctor's appointments. Given Martinez's long history of employment with Rite Aid and the lack of any significant performance problems prior to 2007, the jury reasonably could have inferred that Granillo did not have a good faith belief that the performance-related issues reported by Chau and Chan in 2007 warranted Martinez's discharge.

Contrary to Rite Aid's contention, Martinez also presented evidence that the company failed to take appropriate corrective action in response to her sexual harassment complaint. Martinez first complained to Rite Aid about Lohman's unwanted touching and retaliatory threat during the May 2007 meeting with Granillo. After that meeting, Granillo never spoke with Lohman about Martinez's allegation that he had touched her inappropriately because Granillo did not consider the touching to be sexual harassment. Granillo also did not speak with Lohman about his threat of retaliation because Lohman had already told Granillo about his comment and Granillo had counseled Lohman at that time to not have further contact with Martinez. However, when Granillo orally counseled Lohman about his comment in March 2007, he had no knowledge that Lohman's threat to Martinez was made after she had rebuffed his sexual advance. Lohman merely told Granillo that he had made the comment in response to rude behavior by Martinez. Once Martinez complained about sexual harassment, Granillo was on notice that Lohman's comment may have been made in a different context than previously disclosed which, at a minimum, warranted further investigation. Moreover, although Granillo had issued a written warning to Martinez for violating Rite Aid's sexual harassment policy based on her single inappropriate comment about a coworker, he did not take any disciplinary action against Lohman for his inappropriate touching and retaliatory threat toward a subordinate beyond mere oral counseling.

Based on the totality of the evidence, the jury reasonably could have concluded that Granillo acted with a retaliatory motive when he failed to take appropriate corrective action in response to Martinez's sexual harassment complaint and then terminated her employment less than three months later based on unreliable reports of performance

28

issues.  The jury's verdict in favor of Martinez on her claim for wrongful termination in violation of public policy was therefore supported by substantial evidence.

### B.      Intentional Infliction of Emotional Distress

The jury also returned a special verdict in favor of Martinez on her causes of action for intentional infliction of emotional distress against Rite Aid as an employer and against Chau as an individual.  On appeal, Rite Aid and Chau argue that they are entitled to judgment on this claim because it either was barred by the exclusive remedy provisions of the Workers' Compensation Act, or was based on workplace conduct that was not extreme or outrageous as a matter of law.  We conclude that neither argument has merit.

To establish a claim for intentional infliction of emotional distress, the plaintiff must prove "'''(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.''''"  (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001.)  A defendant's conduct is "outrageous" when it is so "'''extreme as to exceed all bounds of that usually tolerated in a civilized community.''''"  (*Ibid*.)  If properly pled, a claim for workplace harassment based on a protected characteristic can establish the outrageous behavior element of a cause of action for intentional infliction of emotional distress.  (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1051; *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 618.)  On the other hand, "[l]iability for intentional infliction of emotional distress '"does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." [Citation.]' [Citations.]"  (*Hughes v. Pair*, *supra*, at p. 1051.)  "'"Where reasonable [minds] may differ, it is for the jury . . . to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.' [Citations.]"  (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 499.)

A cause of action for intentional infliction of emotional distress arising out of the employment relationship may be subject to the exclusive remedy provisions of the

Workers' Compensation Act (Lab. Code, § 3600 et seq.). In particular, "when the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by characterizing the employer's decisions as manifestly unfair, outrageous, harassment or intended to cause emotional disturbance resulting in disability." (*Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 160; *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 25 [discipline and criticism are a normal part of the employment relationship; "[e]ven if such conduct may be characterized as intentional, unfair, or outrageous, it is nevertheless covered by the workers' compensation exclusivity provisions"].)

"The Legislature, however, did not intend that an employer be allowed to raise the exclusivity rule for the purpose of deflecting a claim of discriminatory practices. [Citations.]" (*Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 352.) Accordingly, "where a plaintiff can allege that she suffered emotional distress because of a pattern of continuing violations that were discriminatory, her cause of action for infliction of emotional distress will not be barred by the exclusivity provisions of workers' compensation laws. This is so because the claim is 'founded upon actions that are outside the normal part of the employment environment . . . .' [Citation.]" (*Murray v. Oceanside Unified School Dist.* (2000) 79 Cal.App.4th 1338, 1363; see also *Fretland v. County of Humboldt* (1999) 69 Cal.App.4th 1478, 1492 ["emotional distress claims are not barred by the exclusivity rule to the extent they seek emotional distress damages for the alleged work-related injury discrimination"]; *Kovatch v. California Casualty Management Co.* (1998) 65 Cal.App.4th 1256, 1277 ["claim for wrongful termination in violation of public policy is one type of claim that is not barred by the exclusive remedy provisions of the Workers' Compensation Act"], disapproved on other grounds in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19; *Accardi v. Superior Court*, *supra*, at p. 352 ["claim for emotional and psychological damage, arising out of employment, is not barred where the distress is engendered by an employer's illegal

30

discriminatory practices"].) In this case, Martinez presented substantial evidence to support a finding that she was subjected to a continuing pattern of workplace discrimination and harassment at Rite Aid which was intended to cause, and did in fact cause, her severe emotional distress.

Specifically, there was evidence that Chau repeatedly made derogatory remarks about Martinez's mental disability and age. On multiple occasions, Chau called Martinez "crazy," "bipolar," and "psycho," and said that "she needed to see [her] psychiatrist." On other occasions, Chau told Martinez in the presence of her younger coworkers that she was "too old," "over the hill," and "old enough to be [their] mother." In addition to these comments, Chau made sudden unwarranted changes to Martinez's work schedule and subjected her to unreasonable work demands. Chau also falsely accused Martinez of poor performance and unprofessional conduct to district-level management, and then solicited Martinez's coworkers to provide false statements about her performance as part of a concerted effort to get her fired. Chau's conduct toward Martinez was so egregious that it was found to be a violation of Rite Aid's code of ethics policy and standards of conduct, and resulted in his suspension, demotion, and transfer to a different store.

There was also evidence that Chan engaged in a series of discriminatory and harassing acts toward Martinez based on her mental disability. After Martinez disclosed to Chan that she was being treated by a mental health care provider, Chan made multiple derogatory comments about Martinez's mental health, telling Martinez that she was "mentally a problem" and should "go see [her] psychiatrist." Chan later refused to allow Martinez to attend doctor's appointments and advised Martinez that she had to find her own coverage to take any time off from work. Chan also placed unreasonable work demands on Martinez by ordering her perform multiple tasks at the same time, and then falsely reporting to district-level management that Martinez was refusing to follow her orders. After Martinez complained about Chan's conduct to Granillo and Acosta, Chan also falsely accused her of making frequent prescription labeling errors.

In addition to the discriminatory and harassing conduct of Chau and Chan, there was evidence that Lohman threatened to retaliate against Martinez in her employment

31

because she had rebuffed his sexual advance a few months earlier. As discussed above, rather than take prompt remedial action to address Martinez's sexual harassment complaint, Granillo failed to conduct any investigation into Martinez's allegations of inappropriate and retaliatory conduct by Lohman. Granillo also failed to investigate Martinez's reported concern that a former supervisor may have been sharing information about her prior medical condition with other Rite Aid employees. Instead, both Granillo and Acosta also made derogatory comments about Martinez's mental health, calling her "unbalanced" and "mentally off" during the disciplinary process. Less than two months after Martinez made the sexual harassment complaint, Granillo issued her a final written warning and then terminated her employment several weeks later.

Because Martinez's cause of action for intentional infliction of emotional distress was based on a pattern of continuing violations that were discriminatory and harassing, her claim was not barred by the exclusive remedy provisions of workers' compensation laws. Furthermore, Martinez's evidence that multiple management-level employees engaged in a series of discriminatory and harassing acts in an effort to get her fired was sufficient to support the jury's finding that such conduct was outrageous and intended to cause Martinez severe emotional distress. Both Rite Aid and Chau assert that Martinez's claim was primarily based on personnel management decisions which do not rise to the level of outrageous conduct as a matter of law. However, Martinez presented substantial evidence that the conduct of her supervisors extended beyond unfair discipline and criticism about her performance to include repeated derogatory remarks about her mental disability and age. Chau's conduct, in particular, went outside of the normal employment environment, as he devised a scheme to effect Martinez's discharge by soliciting false statements from his subordinate employees to present to human resources. Given the totality of discriminatory and harassing conduct directed at Martinez by Chau and other Rite Aid employees, there was substantial evidence to support the jury's verdicts finding both Rite Aid and Chau liable for intentional infliction of emotional distress.

32

## C. Invasion of Privacy

In its special verdict, the jury further found in favor of Martinez on her cause of action against Rite Aid for invasion of privacy. Rite Aid asserts that the judgment on this claim must be reversed because Martinez did not meet her burden of proving that any Rite Aid employee disclosed any private facts about her medical condition to the public. We agree that Rite Aid is entitled to judgment notwithstanding the verdict on this cause of action because Martinez failed to establish the essential elements of her claim.

Martinez's invasion of privacy claim was premised on Rite Aid's alleged disclosure of private facts about her medical condition to employees with no legitimate interest in such information. The elements of a cause of action for invasion of privacy based on the public disclosure of private facts are as follows: "'(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern.'" (*Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 214.) "The absence of any one of these elements is a complete bar to liability. [Citation.]" (*Moreno v. Hanford Sentinel, Inc.* (2009) 172 Cal.App.4th 1125, 1130.)

As noted above, "a crucial ingredient of the tort premised upon invasion of one's privacy is a public disclosure of *private facts* [citations], that is, the unwarranted publication of intimate details of one's private life which are outside the realm of legitimate public interest [citation]. . . . [T]here can be no privacy with respect to a matter which is already public [citation] or which has previously become part of the 'public domain' [citation.]" (*Sipple v. Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1047.) Thus, "there is no liability when the defendant merely gives further publicity to information about the plaintiff which is already public or when the further publicity relates to matters which the plaintiff leaves open to the public eye [citations]." (*Ibid.*; see also *Moreno v. Hanford Sentinel, Inc.*, *supra*, 172 Cal.App.4th at p. 1131 [where defendant "was merely giving further publicity to already public information," invasion of privacy claim failed].) "The gravamen of the tort is unwarranted publication of

intimate details of plaintiff's private life. [Citations.]" (*Porten v. University of San Francisco* (1976) 64 Cal.App.3d 825, 828.)

Martinez's theory at trial was that Desai, the Pasadena pharmacy manager who witnessed Martinez's anxiety attack in February 2004, must have disclosed information about her medical condition to other Rite Aid employees because Martinez's supervisors and coworkers at different stores began making disparaging comments about her mental health upon her return to work. Even assuming there was sufficient evidence to support an inference that Desai discussed Martinez's anxiety attack with other employees, Martinez failed to establish that such disclosure was of "private facts." None of the evidence at trial showed that Martinez or anyone else at Rite Aid shared any information about Martinez's mental disability with Desai.[4] At most, the evidence showed that Desai became aware at some point that Martinez had a "nervous breakdown," but the source of that information and the nature of its disclosure were not identified. Although Desai did attempt to obtain confidential information about Martinez's medical condition directly from her health care provider in February 2004, no information about Martinez was provided to her. Therefore, to the extent that Desai disclosed any facts about Martinez's medical condition to other Rite Aid employees, the only reasonable inference that could be drawn from the evidence was that the disclosure of such information was based on Desai's witnessing of Martinez's anxiety attack in February 2004. That information, however, was not a private fact.

Martinez's anxiety attack took place during regular business hours at Rite Aid's Pasadena store in the presence of Desai and other store employees. Due to the severity of

---

[4]     In her respondent's brief, Martinez stated that she told Desai she was seeing a psychiatrist and cited to two trial exhibits in support of this statement. However, Trial Exhibit No. 58 solely consists of three appointment cards for medical appointments that Martinez had in 2007 when she was working with Chan, not Desai, at the Arcadia store. Trial Exhibit No. 483 is a declaration from Martinez in opposition to a motion in limine, but only two paragraphs from that declaration were admitted into evidence at trial and neither concerned any statements to Desai. Martinez also never testified at trial that she told Desai any information about her medical condition.

34

the attack, Martinez had be removed from the store by ambulance. While Martinez's underlying medical condition which led to the attack was clearly a private matter, the fact that she suffered an anxiety attack in the workplace was not. Instead, it was an incident that occurred within the public space of the retail drugstore and was readily observable by other Rite Aid employees and passing customers. Because Martinez did not have a reasonable expectation of privacy in the mere fact of her anxiety attack, Rite Aid cannot be held liable for Desai's alleged conduct in giving further publicity to that fact by disclosing it to other employees. Rite Aid accordingly was entitled to judgment on Martinez's cause of action for invasion of privacy.

## II. Alleged Attorney Misconduct

Rite Aid and Chau argue that Martinez's trial counsel committed prejudicial misconduct by improperly injecting issues of race and national origin discrimination into the trial despite the absence of any race-based claims. In support of this argument, they point to counsel's questions to Martinez and other testifying witnesses about whether Chau or Chan treated Hispanic employees differently, and whether Chan, in particular, made derogatory statements about Hispanics. They also point to a portion of counsel's closing argument during the punitive damages phase of the trial in which he commented on the history of California's anti-discrimination statutes from the original protections afforded to racial minorities to the subsequent inclusion of protections for people with disabilities.[5] Rite Aid and Chau assert that these repeated references to race and national

_____

[5]      Over the objection of Rite Aid's counsel, Martinez's counsel made the following statement during closing argument: ". . .[T]he Fair Employment [and] Housing Act . . . had as its purpose to give an equal opportunity at the time for the African Americans who for decades and decades have been suppressed economically, minorities, Hispanics, Mexicans, people of all different colors who through that time period it was such gross disparity in their opportunities in the workplace that the legislature in California enacted these laws. Years go by before that was extended to people with disabilities, and the import and the purpose behind those laws basically recognize that corporations don't react to persuasion . . . . In general, most corporations don't react to just telling them what to do or of conscience. They react to the bottom line: to money. And as the years

origin discrimination constituted an improper appeal to racial bias which prejudiced their right to a fair trial. This argument, however, does not withstand scrutiny.

Under certain circumstances, misconduct by counsel can result in prejudicial error entitling the aggrieved party to a reversal of the judgment and a new trial. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 802; *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870.) In general, "the questioning or argument of counsel relative to the race, nationality or religion of a party, when irrelevant to the issues, is improper," and thus, can constitute misconduct. (*Kolaric v. Kaufman* (1968) 261 Cal.App.2d 20, 27-28). "But it is not enough for a party to show attorney misconduct. In order to justify a new trial, the party must demonstrate that the misconduct was prejudicial. [Citation.]" (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 149.) Such prejudicial error cannot be shown unless there is a reasonable probability that the aggrieved party would have achieved a more favorable result in the absence of the error. (*Cassim v. Allstate Ins. Co.*, *supra*, at p. 802; *Garcia v. ConMed Corp.*, *supra*, at p. 149.)

Although Martinez did not assert any claims based on race or national origin discrimination in her civil action, the evidence of racial bias by her supervisors at Rite Aid was not irrelevant to the issues being tried. In the administrative charge that Martinez filed with the EEOC, she alleged that she was being discriminated against on the basis of her sex, age, and national origin, but not on the basis of her disability. Given that Martinez later abandoned her national origin-based claim in favor of a disability-based claim at trial, her counsel's questions regarding race and national origin discrimination were relevant to Martinez's credibility. In the absence of such evidence, the jury might have inferred that, when Martinez complained to the EEOC, she was simply throwing out various theories of discrimination without a reasonable belief in any of them. Additionally, there was evidence that, during the disciplinary process, Martinez

---

went on and these laws were enforced -- and in the beginning they were not enforced very heartedly by the courts, frankly; in the south they were not enforced almost at all for years and years, but over time they were enforced -- modern day they are starting to be enforced. But you still have these renegade corporations."

complained to Granillo that Chan had made racially derogatory remarks about Hispanics, but Granillo never investigated those allegations.[6] Granillo's refusal to investigate Martinez's complaints about racially discriminatory conduct by Chan while readily accepting Chan's complaints about poor performance by Martinez was further evidence of pretext in his discharge decision.

Even assuming that some of the questioning and argument by Martinez's counsel was not relevant to the issues being tried, there has been no showing of prejudicial error. This was a lengthy trial which was aggressively litigated by both sides. More than 25 witnesses testified over a period of several weeks, and only a small number of them were asked any questions about racial bias by Martinez's supervisors. To the extent that such questions were asked, they were limited in scope and were neither inflammatory nor likely to evoke an emotional bias against Rite Aid or Chau. Counsel's reference to the origins of California's civil rights laws during his closing argument was also brief in nature, and on its face, does not reflect an improper appeal to racial bias. Because there was no reasonable probability that Rite Aid or Chau would have obtained a more favorable verdict in the absence of the challenged questions and argument, any purported misconduct by Martinez's counsel was not reversible error.

### III. Jury Verdicts on Compensatory Damages

Rite Aid and Chau contend that they are entitled to a new trial on the issue of compensatory damages because the jury's verdicts awarding economic and non-economic damages to Martinez are duplicative, ambiguous, and excessive as a matter of law. Martinez counters that Rite Aid and Chau have waived any claim of error on these

---

[6]     Martinez specifically told Granillo during their August 8, 2007 meeting that Chan made statements that Hispanics have too many babies, that Hispanics come here without any money and then spend it highlighting their hair, and that Rite Aid's Spanish-speaking employees should only speak to customers in English. Although Granillo testified that he spoke with Chan about these alleged comments and she denied them, Chan testified that no one at Rite Aid asked her any questions about her treatment of Martinez or Martinez's complaints about harassment after July 17, 2007.

grounds, and even if there were no waiver, the damages awards were neither duplicative nor excessive, but rather were supported by substantial evidence.  Based on a careful review of the evidence and instructions at trial, we conclude that the jury's compensatory damages verdicts are impermissibly ambiguous, requiring a reversal of those verdicts and remand for a new trial on the issue of compensatory damages.

### A.    Applicable Law

In assessing a challenge to a special verdict on the ground that it is ambiguous, the following legal standards apply:  "'If the verdict is ambiguous the party adversely affected should request a more formal and certain verdict.  Then, if the trial judge has any doubts on the subject, he [or she] may send the jury out, under proper instructions, to correct the informal or insufficient verdict.'  [Citations.]  But where no objection is made before the jury is discharged, it falls to 'the trial judge to interpret the verdict from its language considered in connection with the pleadings, evidence and instructions.'  [Citations.]  Where the trial judge does not interpret the verdict or interprets it erroneously, an appellate court will interpret the verdict if it is possible to give a correct interpretation.  [Citations.]  If the verdict is hopelessly ambiguous, a reversal is required, although retrial may be limited to the issue of damages.  [Citations.]"  (*Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456-457, fn. omitted.)

As the California Supreme Court has explained, "[r]egardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence.  [Citation.]  Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited.  [Citation.]  [¶] . . . [¶] In contrast, where separate items of compensable damage are shown by distinct and independent evidence, the plaintiff is entitled to recover the entire amount of his damages, whether that amount is expressed by the jury in a single verdict or multiple verdicts referring to different claims or legal theories.  [Citation.]"  (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158-1159.)  Where it is impossible to determine to a reasonable degree of certainty

whether the jury awarded duplicative damages, the proper remedy is ordinarily a reversal of the damages verdict and a remand for a new trial on damages. (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 703, 705 (*Roby*).)

### B. No Waiver

Martinez asserts that any challenge to the compensatory damages awards on the ground that they are duplicative has been waived because Rite Aid rejected the trial court's offer to inquire of the jury on this issue prior to discharge. However, the record reflects that, before the jury was discharged, Rite Aid made a motion for a more certain verdict on the basis that the compensatory damages awards were ambiguous and appeared to be duplicative. Rite Aid's counsel specifically asked "for a correction while the jury is still impaneled to sufficiently determine what the damages were supposed to be." During the hearing on the motion, the trial court initially indicated that it might be willing to ask the jury if the damages awarded on the different causes of action were counted only once in the verdict, but it wanted to first hear from Martinez's counsel on the matter. Martinez's counsel stated that he would agree to submit a special finding question to the jury as to whether the total damages awarded to Martinez was $3.4 million as indicated in the special verdict form, but would object to any other inquiry. After further argument from counsel, the trial court denied Rite Aid's motion for a more certain verdict outright, finding that "the verdict form is extremely clear," and "how [the jury] got to the decision that's not for us to go into." Therefore, contrary to Martinez's contention, Rite Aid did request a correction or clarification of the verdict before the jury was discharged, which was denied by the trial court. There has been no waiver.[7]

---

[7] Martinez also argues that Rite Aid waived any claim that the damages awards are excessive by failing to bring its motion for a new trial to a hearing before the trial court within the 60-day statutory period. Ordinarily, the failure to move for a new trial precludes a party from arguing on appeal that damages were excessive or inadequate. (*Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 581, fn. 3.) However, "'the merits of a motion for a new trial denied by operation of law [that is, by expiration of the 60-day time period] may be reviewed upon appeal in the

## C.    Economic Damages Awards

As discussed above, the jury found in favor of Martinez on three causes of action: (1) wrongful termination in violation of public policy; (2) intentional infliction of emotional distress; and (3) invasion of privacy.  As to each cause of action against Rite Aid, the jury awarded the same exact amount of economic damages -- $20,000 for past economic loss and $150,000 for future economic loss.  As to the intentional infliction of emotional distress cause of action against Chau, the jury awarded $12,500 for past economic loss and $12,500 for future economic loss.  Question No. 40 of the special verdict form asked the jury to state the total amount of damages awarded for each category of loss and noted that "the same damages which resulted from different causes of action must be counted only once."  In response to this question, the jury stated that the total amount of past economic loss was $72,500 and the total amount of future economic loss was $462,500, for a total economic damages award of $535,000.  The jury's award was approximately $99,000 less than the $634,055 in total economic damages that had been requested by Martinez.

Although the total amount of past and future economic damages awarded against Rite Aid was generally consistent with the damages calculated by Martinez's economic expert, the jury's awards are nevertheless ambiguous.  Martinez's sole evidence of economic damages was that of past and future lost earnings resulting from her termination of employment at Rite Aid and inability to find alternative employment.  Martinez did not present any evidence of additional economic damages resulting from the

same manner as if expressly denied by the court.'  [Citations.]  This is true even where the appellant has caused the failure to have the motion heard within 60 days [citations] . . . ."  (*In re Marriage of Liu* (1987) 197 Cal.App.3d 143, 152, fn. omitted.)  While the record fails to disclose why Rite Aid's motion for a new trial was not heard by the trial court, Rite Aid did preserve its objection to the damages awards by timely filing the motion which was denied by operation of law.  Moreover, regardless of whether Rite Aid made a timely motion for a new trial, it is not precluded from asserting other legal errors, including a failure to apply the proper measure of damages to the claims.  (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 122.)

alleged intentional infliction of emotional distress or invasion of privacy. Additionally, the jury was instructed that if it found Rite Aid had discharged Martinez in violation of public policy, it should determine the total amount of economic damages she was entitled to recover. The jury was not instructed that economic damages were also available on the intentional infliction of emotional distress and invasion of privacy claims. Accordingly, if the jury properly followed the instructions and the evidence presented at trial, it would have compensated Martinez for the full amount of her past and future economic losses on her wrongful termination claim, and would not have allocated her total economic damages among the three claims.

The decision in *DuBarry Internat., Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552 (*DuBarry*) is instructive on this issue. In *DuBarry*, the jury found in favor of the plaintiff on his claims for breach of contract and bad faith denial of the existence of a contract, and awarded economic damages of $1,502,604 on each claim. However, the only evidence offered by the plaintiff as to his economic damages was based on lost commissions. The Court of Appeal held that the damages awards were impermissibly duplicative because the jury had been instructed that the plaintiff was entitled to recover the total amount of economic loss resulting from the breach of contract, and thus, his lost commissions were fully compensated by the damages award on that claim. (*Id*. at p. 563.) In so holding, the court rejected the plaintiff's argument that "since the damage evidence would have supported a verdict higher than $ 1,502.604, the jury could well have awarded one-half of the total damages on each cause of action." (*Ibid*., fn. omitted.) The court reasoned that "[s]uch a conclusion requires us to assume that the jury ignored the clear instructions it had been given. This we cannot do." (*Id*. at pp. 563-564; see also *Shell v. Schmidt* (1954) 126 Cal.App.2d 279, 293-294 [reversing damages verdict where jury was improperly instructed it could calculate the total amount of damages and then "split" the award between plaintiffs' fraud and contract claims].)

In this case, the economic damages awards against Rite Aid are ambiguous as to whether the jury improperly duplicated damages. On the wrongful termination claim, the jury awarded Martinez $20,000 in past economic damages and $150,000 in future

41

economic damages.  If, as Rite Aid suggests, the jury found that Martinez's total past and future economic damages were $20,000 and $150,000, respectively, then the awards of economic damages in identical amounts on the intentional infliction of emotional distress and invasion of privacy claims were duplicative.  If, on the other hand, as Martinez suggests, the jury found that her total past and future economic damages were $60,000 and $450,000, respectively, then the jury improperly allocated the damages among the three claims because there was no evidence that Martinez suffered any economic damages that were not related to and arising out of her discharge.  Either way, it appears the economic damages awards against Rite Aid were not properly assessed.

The jury's economic damages awards against Chau are also ambiguous and possibly duplicative.  There was no evidence that Chau caused Martinez to suffer any lost earnings when he subjected her to discriminatory and harassing treatment prior to her discharge.  To the extent that Chau's outrageous conduct toward Martinez contributed to Rite Aid's subsequent decision to terminate her employment, any economic damages resulting from the discharge should have been awarded on the wrongful termination claim.  Moreover, according to Martinez's economic expert, the total amount of past economic damages incurred by Martinez through the start of trial was $57,489.  Yet the jury awarded Martinez $60,000 in past economic damages against Rite Aid and an additional $12,500 in past economic damages against Chau.  While the $60,000 award against Rite Aid may have been the result of rounding, the additional $12,500 award against Chau is not supported by any evidence.

In sum, the total past and future economic losses suffered by Martinez should have been fully compensated by the economic damages awards on the wrongful termination claim.  Because the jury's verdicts are hopelessly ambiguous as to whether the jury applied the proper measure of economic damages to Martinez's claims, the economic damages awards against both Rite Aid and Chau cannot stand.

## D. Non-Economic Damages Awards

The jury's verdicts on the non-economic damages awards appear to suffer from similar deficiencies. As to each cause of action against Rite Aid, the jury awarded nearly identical amounts of non-economic damages -- $813,333 for past non-economic loss and $133,333 for future non-economic loss.[8] As to the intentional infliction of emotional distress cause of action against Chau, the jury awarded $12,500 for past non-economic loss and $12,500 for future non-economic loss. On Question 40 of the special verdict form, the jury stated that the total amount of past non-economic loss was $2,452,500 and the total amount of future non-economic loss was $412,500, for a total non-economic damages award of $2,865,000. The jury's award was slightly more than the $2,840,000 in total non-economic damages requested by Martinez.

In *Roby*, the California Supreme Court held that where non-economic damages awarded on different causes of action "overlapped in part, then, to the extent of the overlap, adding the awards together had the effect of compensating [the plaintiff] multiple times for the same injury." (*Roby*, *supra*, 47 Cal.4th at p. 703.) The plaintiff in *Roby* prevailed at trial on three related causes of action against her former employer -- wrongful termination in violation of public policy, disability discrimination in violation of FEHA, and failure to accommodate a disability in violation of FEHA. While the plaintiff's wrongful termination claim focused exclusively on the termination itself, her two statutory FEHA claims encompassed both the termination and other employment actions that preceded the termination. (*Id*. at p. 702.) The jury awarded varying amounts of non-economic damages on each cause of action, which exceeded the total amount of non-economic damages sought by the plaintiff. (*Id*. at pp. 698-699.) The Supreme Court concluded that the jury's non-economic damages awards were "hopelessly ambiguous" because it was "impossible to determine to a reasonable degree of certainty" whether the

---

8      On the invasion of privacy claim, the jury added $1 to both the past and future non-economic damages awards.

43

awards were intended to be mutually exclusive, or if not, to what extent they overlapped. (*Id*. at pp. 693, 703.) The same ambiguities are present in this case.

Martinez's claim for wrongful termination in violation of public policy focused exclusively on the termination itself, and thus, the non-economic damages awarded on that claim solely compensated Martinez for the emotional distress caused by the termination. On the other hand, Martinez's claim for intentional infliction of emotional distress encompassed both the termination and the discriminatory and harassing conduct that preceded the termination. As a result, Martinez's non-economic damages on the intentional infliction of emotional distress claim overlapped, in part, with her non-economic damages on the wrongful termination claim. Additionally, to the extent the jury's non-economic damages award against Rite Aid for intentional infliction of emotional distress was based on Rite Aid's vicarious liability for Chau's conduct, that portion of the award would appear to duplicate the non-economic damages that were separately awarded against Chau.

The fact that the jury awarded nearly identical amounts of non-economic damages on each of the three claims alleged against Rite Aid further suggests that the jury may not have understood how to properly assess damages. As Rite Aid points out, the evidence at trial showed that Martinez suffered greater emotional distress from the discharge than from the other alleged wrongful acts, as both her treating psychologist and medical expert testified that Martinez's depression and anxiety became significantly worse upon her termination of employment. Given the apparent overlap in damages among the different causes of action, we cannot conclude from this record that the jury's non-economic damages awards on each claim were intended to be mutually exclusive.

"'[A]n appellate court will interpret the verdict if it is possible to give a correct interpretation,' but will reverse if the verdict is 'hopelessly ambiguous.' [Citation.]" (*Roby*, *supra*, 47 Cal.4th at p. 705.) Because the jury's awards of economic and non-economic damages against Rite Aid and Chau are impermissibly ambiguous, each of the compensatory damages verdicts must be reversed and the matter remanded for a new trial

44

on compensatory damages as to all remaining claims.  (*Ibid*.; *Woodcock v. Fontana Scaffolding & Equip. Co.*, *supra*, 69 Cal.2d at p. 457.)

### IV.  Jury Verdict on Punitive Damages

Rite Aid also challenges the sufficiency of the evidence supporting the jury's award of punitive damages.  Among other arguments, Rite Aid asserts that Martinez failed to establish by clear and convincing evidence that any officer, director, or managing agent of the company engaged in, authorized, or ratified the alleged malicious conduct.  Martinez, on the other hand, argues that there were four managing agents -- Granillo, Lohman, Acosta, and Sapp -- whose actions warranted the imposition of punitive damages liability against Rite Aid.  We agree with Rite Aid that the evidence was insufficient to support a finding of employer liability for punitive damages.

Section 3294, subdivision (a) of the Civil Code permits an award of punitive damages "for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  On appeal, a jury's award of punitive damages must be upheld if it is supported by substantial evidence.  (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 679; *Kelly v. Haag* (2006) 145 Cal.App.4th 910, 916.)  "As in other cases involving the issue of substantial evidence, we are bound to 'consider the evidence  in the light most favorable to the prevailing party, giving him the benefit of every reasonable inference, and resolving conflicts in support of the judgment.'  [Citation.]"  (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891, italics omitted.)  However, as "the jury's findings were subject to a heightened burden of proof, we must review the record in support of these findings in light of that burden.  In other words, we must inquire whether the record contains 'substantial evidence to support a determination by clear and convincing evidence . . . .'  [Citation.]"  (*Ibid*.)

Under Civil Code section 3294, subdivision (b), a corporate employer is not liable for punitive damages based upon the acts of its employees unless the acts were committed, authorized, or ratified by a corporate officer, director, or managing agent.

45

The California Supreme Court has held that the term "managing agent" includes "only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 566-567 (*White*).) Corporate policy refers to "formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership. It is this sort of broad authority that justifies punishing an entire company for an otherwise isolated act of oppression, fraud, or malice." (*Roby*, *supra*, 47 Cal.4th at p. 715.) The "mere ability to hire and fire employees" does not render a supervisory employee a managing agent under Civil Code section 3294. (*White*, *supra*, at p. 566.) "[T]o demonstrate that an employee is a true managing agent . . ., a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*Id*. at p. 577.)

Moreover, the determination of whether certain employees are managing agents within the meaning of Civil Code section 3294 "'does not necessarily hinge on their "level" in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy.' [Citation.]" (*Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 421 (*Kelly-Zurian*).) In *Kelly-Zurian*, the supervisor was the highest ranking person in the employer's Southern California offices and had immediate and direct control over the plaintiff, including the authority to terminate her employment. Nevertheless, he was not a managing agent under Civil Code section 3294 because he did not have the authority to change or establish business policy for the company's Southern California offices. Those policies were set by the corporate headquarters in another state. (*Id*. at pp. 421-422.) In other words, "a supervisor must be in a corporate policymaking position in order to be considered a managing agent for purposes of imposing punitive damages liability on the employer." (*Myers v. Trendwest Resorts, Inc.* (2007) 148 Cal.App.4th 1403, 1437.) In this case, the evidence was insufficient to support a finding that Granillo, Lohman, or Acosta was a managing agent within the meaning of Civil Code section 3294.

46

Granillo was the human resources manager for the district where Martinez worked. There were 75 to 100 human resources managers employed by Rite Aid nationwide, and they primarily were responsible for handling internal personnel complaints, overseeing the performance of store managers and assistant managers, and fielding employee inquiries about benefits, leaves of absence, and payroll issues. Granillo testified that, as a human resources manager, he did not directly supervise any employees, manage any stores, or oversee the day-to-day operations of any business. Granillo also specifically stated that he did not make company policy and did not create any of the policies and procedures contained in Rite Aid's employee handbook. In support of her argument that Granillo was a managing agent who set corporate policy, Martinez relies exclusively on the testimony of Acosta who stated that, based on his individual dealings with human resources managers, he believed they had the authority to determine human resources policies and how they applied in his district. However, Acosta later testified that the officers of Rite Aid were the only ones who determined the policies and procedures for his district, and when asked about the basis for his understanding as to whether human resources managers set corporate policy, Acosta responded that a human resources manager was not an officer of the company. Thus, while Granillo clearly denied that he had any policy-making authority, Acosta's testimony about the role of a human resources manager in determining corporate policy was ambiguous. Even viewing the evidence in the light most favorable to Martinez, Acosta's testimony, standing alone, was insufficient to support a finding that Granillo was a managing agent.

Lohman was the store district manager for the Arcadia store where Martinez worked. As a store district manager, Lohman oversaw "a number of stores" and was "responsible for the general merchandise or the front end of the store." However, apart from this basic job description, the record contains no evidence about the scope of Lohman's responsibilities or discretionary authority at Rite Aid. In the absence of any such evidence, the jury could not reasonably have found that Lohman had sufficient policy-making authority to constitute a managing agent. (See *Gelfo v. Lockheed Martin*

*Corp.* (2006) 140 Cal.App.4th 34, 63 [plaintiff's failure to present any evidence about a corporate vice-president's duties or authority precluded a finding that he was a managing agent of the employer].)

Acosta was the pharmacy district manager for the Arcadia store where Martinez worked. As a pharmacy district manager, Acosta oversaw approximately 30 stores and 150 employees, and had responsibility for managing personnel issues and profit and loss issues for the pharmacies in his district. However, Acosta specifically testified that he did not set any of the policies and procedures for his district. According to Acosta, the officers of Rite Aid had sole responsibility for setting corporate policy and Acosta had no input into the policy-making process. As discussed, the critical inquiry is not the employee's level within the corporate hierarchy, but whether the employee had substantial discretionary authority over decisions that ultimately determine corporate policy. (*White*, *supra*, 21 Cal.4th at pp. 576-577; *Kelly-Zurian*, *supra*, 22 Cal.App.4th at p. 421.) Given Acosta's uncontradicted testimony that he did not have any input in determining Rite Aid's policies and procedures, there was no substantial evidence to support a finding that Acosta was a managing agent.

For purposes of imposing punitive damages liability on Rite Aid, the only employee who arguably could constitute a managing agent within the meaning of section 3294 was Sapp. However, the evidence was insufficient to support a finding that Sapp either engaged in any malicious conduct or ratified the malicious conduct of any other employee. As the California Supreme Court has observed, "ratification generally occurs where, under the particular circumstances, the employer demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious behavior by an employee in the performance of his job duties. [¶] The issue commonly arises where the employer or its managing agent is charged with failing to intercede in a known pattern of workplace abuse, or failing to investigate or discipline the errant employee once such misconduct became known. [Citations.] Corporate ratification in the punitive damages context requires actual knowledge of the conduct and its outrageous nature." (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 726; see also *Cruz v. HomeBase* (2000) 83

48

Cal.App.4th 160, 168 [for purposes of determining corporate liability for punitive damages, a corporation cannot ratify "that which it does not actually know about"].)

The evidence at trial established that Sapp was the director of human resources and labor relations for Rite Aid's western division. In this position, Sapp oversaw approximately 20,000 employees in stores across seven states. Sapp did not directly participate in any of Rite Aid's investigations involving Martinez and had no personal interaction with her. In approving the decision to terminate Martinez's employment, Sapp relied exclusively on the information provided to him by Granillo. Although Sapp was aware that Martinez had filed an administrative charge with the EEOC complaining about discriminatory and retaliatory conduct at Rite Aid, there was no evidence that Sapp approved of the conduct or failed to take appropriate action to investigate and correct it. Nor was there any evidence that Sapp had actual knowledge that Granillo, the person responsible for investigating the complaints made by and about Martinez, was failing to conduct an adequate investigation into her allegations. The record is simply devoid of any evidence of ratification on the part of Sapp or any other officer, director, or managing agent of Rite Aid.[9]

In sum, there was no substantial evidence to support a finding that any officer, director, or managing agent of Rite Aid either participated in the alleged malicious conduct or had actual knowledge of the malicious conduct and thereafter ratified it. The jury's verdict awarding punitive damages to Martinez must therefore be reversed.

## V.    Denial of Motion for Leave to File Third Amended Complaint

In her cross-appeal, Martinez contends that the trial court abused its discretion in denying her motion for leave to file a third amended complaint. The proposed third

---

[9]    Martinez suggests that Rite Aid's chief executive officer ratified the malicious conduct of Martinez's supervisors by failing to take any action in response to her July 2007 letter complaining about a hostile work environment. However, there was no evidence that the chief executive officer of Rite Aid ever received Martinez's letter, or otherwise had any actual knowledge of Martinez's complaints.

amended complaint sought to add four causes of action for statutory violations of FEHA, which would have allowed Martinez to seek the recovery of attorney's fees if she had prevailed on those claims. In denying the motion, the trial court found that Martinez had inexcusably delayed in seeking leave to amend because the proposed FEHA claims were known to Martinez when she filed her original complaint more than a year earlier. We conclude that the trial court did not abuse its discretion in denying leave to amend.

### A.     Relevant Background

In May 2007, Martinez filed a dual administrative charge with the California Department of Fair Employment and Housing (DFEH) and the EEOC in which she alleged discrimination on the basis of sex, age, and national origin, and retaliation for a sexual harassment complaint. The EEOC was responsible for investigating Martinez's charge, and in December 2007, issued a right-to-sue letter.

In November 2008, Martinez filed her original complaint which alleged causes of action for wrongful termination in violation of public policy based on her medical leave of absence and age, and intentional infliction of emotional distress. In March 2009, Martinez filed her first amended complaint which, among other amendments, added a new theory of disability discrimination to her cause of action for wrongful termination in violation of public policy and new causes of action for defamation and invasion of privacy. In her first amended complaint, Martinez specifically identified FEHA as one of the fundamental public policies supporting her wrongful termination claims.

In May 2009, Martinez was granted leave to file a second amended complaint which added new theories of retaliation for complaining about sexual harassment and unsafe work conditions to her cause of action for wrongful termination in violation of public policy. In her second amended complaint, Martinez again identified FEHA as one of the fundamental public policies supporting her wrongful termination claims. The second amended complaint became the operative complaint in the case and set forth the following causes of action:  (1) wrongful termination in violation of public policy based on disability, failure to accommodate, and medical leave of absence; (2) wrongful

50

termination in violation of public policy based on age; (3) wrongful termination in violation of public policy based on retaliation for complaining about sexual harassment and unsafe work conditions; (4) intentional infliction of emotional distress; (5) defamation; (6) invasion of privacy, and (7) loss of consortium.

On November 3, 2009, Rite Aid and Chau filed a motion for summary judgment. On December 7, 2009, while the summary judgment motion was pending, Martinez brought a motion for leave to file a third amended complaint to add statutory claims for violations of FEHA. The proposed third amended complaint purported to allege the following causes of action: (1) wrongful termination in violation of public policy and FEHA based on disability, failure to accommodate, and medical leave of absence; (2) wrongful termination in violation of public policy and FEHA based on age; (3) wrongful termination in violation of public policy and FEHA based on retaliation for complaining about sexual harassment and unsafe work conditions; (4) intentional infliction of emotional distress and pre-termination disability, medical leave, and age harassment under FEHA; (5) defamation; (6) invasion of privacy, and (7) loss of consortium. In support of the motion, Martinez's counsel submitted a declaration in which he stated that he had "inadvertently omitted" the FEHA legal theories when preparing the second amended complaint, and only learned of the error on December 3, 2009 while reviewing the pending summary judgment motion. The motion for leave to amend was originally set for hearing on January 19, 2010, which was also the discovery cut-off date.

On January 21, 2010, the trial court heard both the motion for summary judgment and the motion for leave to amend. The court denied the summary judgment motion in its entirety. The court also denied the motion for leave to amend on the ground that Martinez was not entitled to amend her complaint while the summary judgment motion was pending. Trial in the case was set for April 28, 2010.

On January 22, 2010, Martinez brought another motion for leave to file a third amended complaint. On March 23, 2010, the trial court denied that motion on several grounds. The court found that the motion was an improper motion for reconsideration and untimely. The court also found that Martinez failed to demonstrate that she was truly

51

unaware of her statutory FEHA claims given that she had alleged causes of action that were based on FEHA in her original complaint.  In addition, the court found that Martinez was aware as early as December 2007 that the EEOC's investigation of her administrative charge had closed, but she never asserted any FEHA claims when she filed her civil action in November 2008.

### B.    Applicable Law

A trial court may grant leave to amend the pleadings at any stage of the action. (Code Civ. Proc., § 473, subd. (a)(1) ["The court may, in furtherance of justice, and on any terms as may be proper, allow a party to amend any pleading . . ."].)  "'[T]he trial court has wide discretion in allowing the amendment of any pleading [citations], [and] as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown.  [Citations.]'  [Citation.]" (*Record v. Reason* (1999) 73 Cal.App.4th 472, 486.)  In general, "[c]ourts must apply a policy of great liberality in permitting amendments to the complaint at any stage of the proceedings, up to and including trial, when no prejudice is shown to the adverse party." (*Huff v. Wilkins* (2006) 138 Cal.App.4th 732, 746.)  However, "'[t]he law is well settled that a long deferred presentation of the proposed amendment without a showing of excuse for the delay is itself a significant factor to uphold the trial court's denial of the amendment.  [Citation.]'  [Citation.]  'The law is also clear that even if a good amendment is proposed in proper form, unwarranted delay in presenting it may -- of itself -- be a valid reason for denial.'  [Citation.]" (*Leader v. Health Industries of America, Inc.* (2001) 89 Cal.App.4th 603, 613.)  Consequently, "appellate courts are less likely to find an abuse of discretion where . . . the proposed amendment is '"offered after long unexplained delay . . . or where there is a lack of diligence. . . ."'  [Citation.]" (*Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168, 175.)

### C.    No Abuse of Discretion

In this case, the trial court acted within its discretion in denying Martinez's motion for leave to file a third amended complaint.  Contrary to Martinez's claim on appeal, the

52

trial court did consider the merits of her motion in denying her leave to amend, and reasonably concluded that Martinez's belated effort to add statutory FEHA claims was the result of inexcusable delay. The record reflects that Martinez was aware of the facts giving rise to a FEHA cause of action as early as May 2007 when she first complained about unlawful discrimination and retaliation to the EEOC. Martinez also was aware as early as December 2007, when the EEOC closed its investigation and issued her a right-to-sue letter, that she had until December 2008 to bring a civil action for any statutory violations of FEHA. Martinez filed her original complaint in November 2008 and twice amended it to add new theories of recovery to her claims for wrongful termination in violation of public policy. In amending her wrongful termination claims, Martinez specifically identified FEHA as one of the fundamental public policies giving rise to those claims, yet did not allege any statutory claims for violations of FEHA.[10]

Martinez's only proffered explanation for her failure to plead statutory FEHA claims in any of her three prior complaints was her counsel's statement that the omission was inadvertent and not discovered until his review of the pending motion for summary judgment in December 2009. But given that Martinez's counsel had already twice amended the complaint to allege wrongful termination in violation of public policy claims that were explicitly based the public policies embodied in FEHA, the trial court reasonably could have found that counsel's explanation for the delay was not credible. The trial court's decision to deny Martinez further leave to amend based on inexcusable delay was therefore a proper exercise of its discretion.

---

[10]    Martinez states that only the second cause of action for wrongful termination in violation of public policy based on her age explicitly referenced FEHA. However, a review of Martinez's first and second amended complaints shows that she specifically identified FEHA as a fundamental public policy in her first cause of action for wrongful termination in violation of public policy based on her disability and medical leave of absence, and that she incorporated those allegations into her other wrongful termination claims.

Martinez asserts that unwarranted delay in seeking to amend a pleading is an insufficient basis for denying leave to amend unless it will prejudice the opposing party. Martinez also reasons that, because her proposed FEHA claims merely supported a new theory of recovery based on the same set of facts in her second amended complaint, no prejudice could result from the amendment. However, as discussed, unwarranted delay in presenting an amendment may, in and of itself, constitute a sufficient basis for the denial. Furthermore, Martinez has not shown the absence of any prejudice to Rite Aid. Although the proposed FEHA claims were based on the same operative facts as the wrongful termination claims, the FEHA claims gave rise to additional affirmative defenses, including a failure to exhaust administrative remedies. Indeed, Rite Aid opposed Martinez's motion for leave to amend partially on the ground that she had not exhausted her administrative remedies as to her proposed FEHA claims because they were not included in her administrative charge. Granting Martinez leave to add these statutory claims thus could have necessitated another summary judgment proceeding to address whether Martinez satisfied the jurisdictional prerequisites to bringing a civil suit under FEHA, and possibly additional discovery about the scope of Martinez's administrative charge and the EEOC's investigation. (See, e.g., *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 266 ["'exhaustion requirement is satisfied if the allegations of the civil action are *within the scope of the EEOC charge*, any EEOC investigation actually completed, or any investigation that might reasonably have been expected to grow out of the charge'"]; *Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 154 [same].)

Under these circumstances, the trial court reasonably could have found that Martinez's unwarranted delay in seeking to add statutory FEHA claims after the motion for summary judgment had been decided was prejudicial to Rite Aid and Chau. The trial court did not abuse its discretion in denying Martinez's motion for leave to file a third amended complaint.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court for a new trial on the issue of compensatory damages as to the causes of action for wrongful termination in violation of public policy against Rite Aid and intentional infliction of emotional distress against Rite Aid and Chau. Each party shall bear its own costs on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

JACKSON, J.